# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

| | |
|---|---|
| **RONALD J. CAPTAIN and** : | |
| **SHARON P. CAPTAIN,** : | |
| : | |
| **Plaintiffs,** : | |
| **v.** : | **COMPLAINT AND** |
| : | **DEMAND** |
| **Bank of America, N.A.,** : | **FOR JURY TRIAL** |
| : | |
| **Defendant.** : | |
| : | |
| : | |
| : | |

NOW COMES the Plaintiffs, by and through undersigned counsel, files this Complaint against Defendant, Bank of America, N.A. as follows:

## PARTIES

1.      Plaintiffs are individuals who are citizens of Leon County, Florida, residing at 9783 Wyntree Lane, Tallahassee, Florida.

2.      Defendant, Bank of America, N.A. (hereinafter "BOA"), is a Delaware Corporation, with its principal office address located at 101 S. Tryon Street, Charlotte, North Carolina.

3.      Defendant is authorized to do business in this district and derive income from doing business in this district.

4.      Upon information and belief, Defendant purposefully availed themselves of the privilege of conducting activities within this district, thus invoking the benefits and protections of its laws.

## JURISDICTION and VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

6.     The Court has personal jurisdiction over the Defendant under Fla. Stat. § 48.193.

7.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Broward County, Florida.

## GENERAL FACTUAL ALLEGATIONS

8.     This Complaint chronicles the fraudulent scheme exacted by BOA on homeowners seeking Home Affordable Modification Program ("HAMP") modifications.   Plaintiffs were victims of this fraud.

9.     In late 2008 and early 2009, the United States Government provided a total of $45 billion dollars to BOA pursuant to the Troubled Asset Relief Program ("TARP").  It also extended to BOA an additional guarantee of over $100 billion dollars.  Having concluded that the costs of allowing BOA to fail were too high, the U.S. Government decided taxpayers would save the life of BOA, and they did.[1]

10.     As the Congressional Oversight Panel ("Panel") described it, "almost overnight" U.S. taxpayers provided to several large financial institutions, including BOA, an infusion of over

---

[1]  United States Department ·of Treasury, Troubled Asset Relief Program Transactions Report, ("Treasury Transaction Report"), available at: https://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx

$200 billion dollars.[2]  This massive bailout allowed the continued existence of several institutions including BOA.

### BOA Agrees to the Home Affordable Modification Program ("HAMP") in Exchange for Billions from Taxpayers

11.     Because the stated purpose of the financial bailout was to help the American people and homeowners in particular, HAMP was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

12.     Knowing all eyes were on it, and on the billions of dollars it had been given by the government, on April 17, 2009, BOA, the nation's largest mortgage servicer, signed a "Servicer Participation Agreement" (the "Agreement" or "HAMP Agreement") with the Federal Government requiring it to use "reasonable efforts" to "effectuate any modification of a mortgage loan under the Program." *See* Sec. 2A **Exhibit 1**

13.     BOA signed this Agreement in exchange for a commitment by the Federal Government to provide BOA hundreds of millions of taxpayer dollars for its promise and obligation to comprehensively provide HAMP screening for all homeowners serviced by BOA.[3]

14.     Once approved for HAMP modification, a homeowner who agrees to participate typically begins a three-month Trial Payment Period during which mortgage payments are made under the terms of the modification.  If timely payments are made during those three months (i. e., not more than 30 days overdue during any month), the homeowner must be offered a permanent modification, with the terms in effect during the Trial Payment Period extended for 5 years.

---

[2] Congressional Oversight Panel, The Final Report of the Congressional Oversight Panel, March 16, 2011, ("Final    Report"), available at
http://www.senate.gov/general/common/generic/COP_redirect.htm.
[3] Treasury Transaction Report at 27.

15.     After a homeowner completes a period of 5 years under the terms of the modification, lenders may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate at the time the modification was made.

16.     The Agreement indicates that BOA "shall perform the services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in order to effectuate any modification of a mortgage loan under the Program." *See* section 2A, **Exhibit 1**.  Servicers, including BOA, received incentive payments to complete HAMP modifications and in March 2010, the incentive was increased to $2,000.00.

### BOA Develops and Orchestrates a Fraudulent Scheme to Avoid HAMP Modifications in Order to Increase Profits

17.     Despite signing the Agreement and accepting billions of dollars, BOA knew conforming to the requirements of the Agreement in providing screening for HAMP applications and accepting homeowners who meet the requirements would cost the bank millions of dollars.

18.     For that reason, instead of honoring its contract with the Federal Government to, in good faith, help as many distressed homeowners as possible, it made a calculated decision.  BOA decided to permit just enough HAMP modifications to occur to create a defense (however untenable) against Federal Government agencies, Congressional skeptics and the public that it was making best efforts to comply with its Agreement.  Simultaneously, however, BOA chose to develop secretive business practices designed to intentionally prevent thousands of eligible applicants from receiving permanent HAMP modifications.

**Former BOA Employees Sign Sworn Declarations**
**Outlining the Fraudulent HAMP Scheme**

19.     Only after Plaintiffs retained their attorneys did Plaintiffs learn of the facts

contained in this section and in the sworn declarations of former BOA employees. Plaintiffs did

not know and could not have reasonably discovered these facts until they retained their attorneys.

20.     According to the February 22, 2017 Declaration of Rodrigo Heinle, (**Exhibit 2**)

who worked for BOA in Charlotte, North Carolina from 2011 through 2012:

    a.  Bank of America employed a common strategy of delaying HAMP applications.
Delay was achieved using tactics including claiming that documents were
incomplete and/or missing when they were not, or simply claiming files were
"under review" when they were not.

    b.   Homeowner applications were routinely shredded with no review by Bank of
America and at times taken home by managers in order to conceal the fact they
had been received by Bank of America.

    c.  Upon the instruction of my manager Jamal Brown, and other managers, I deleted
thousands of homeowner HAMP application files from Bank of America computer
databases, as many as six thousand (6,000) in one day.

21.     According to the June 5, 2013 Declaration of William E. Wilson, Jr., (**Exhibit 3**)

who worked for BOA in Charlotte, North Carolina from 2010 through 2012:

    a.  Individual BOA employees were given "approximately 400 HAMP files" at any
given time.

    b.  "Though BOA required that applicants immediately provide financial documents,
often on short notice, the bank intentionally allowed these documents to sit for
months without ever reviewing them."

    c.  Bank of America instructed its employees to employ a common strategy of delaying
HAMP applications, "claiming that documents were incomplete or missing when
they were not, or simply claiming the file was ''under review' when it was not."
This delay tactic allowed BOA to falsely claim homeowners had not provided the
required documentation when in fact, the homeowner had sent in documents
months earlier, often multiple times and had made payments under a Trial Payment
Period plan, but had not gotten a permanent modification or even a decision
regarding their modification.

    d.   Next, BOA regularly employed a procedure called a "blitz."  "Approximately twice a month, BOA ordered case managers and underwriters 'clean out' the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan" and were entitled to a HAMP modification.

    e.   "During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than that the documents were more than 60 days old. BOA instructed its employees to enter into its computer systems a reason that would justify declining the modification to the Treasury Department.  The justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments. In reality, these justifications were untrue."

    f.   The "homeowners who did not receive the permanent HAMP modification they were entitled to, ultimately lost their homes to foreclosure."

22.    According to the May 23, 2013 Declaration of former BOA Senior Collector of Loss Mitigation employee, Simone Gordon (**Exhibit 4**):

    a.   Employees were given quotas for placing a specific number of accounts into foreclosure, including accounts in which the borrower fulfilled a HAMP Trial Period Plan.  Employees who met quotas for placing "ten or more accounts into foreclosure in a given month received a $500 bonus.  Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure."

    b.   And that Employees were closely monitored by BOA "Team Leaders and Site Leaders who walked the call room floor throughout the day wearing headsets that they would use to plug in and listen into a call without warning.  Employees who were caught not carrying out the delay strategies that BOA instituted were subject to discipline and termination."

    c.   "Employees who were caught admitting that BOA had received financial documents or that the borrower was actually entitled to a permanent loan modification were disciplined and often terminated without warning."

23.    According to the May 15, 2013 Declaration of former BOA collection employee, Theresa Terrelonge (**Exhibit 5**):

    a.   BOA "was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP. It was well known

among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."

b. BOA employees "were called into group meetings with our supervisors on a regular basis. The information we received in group meetings showed me that Bank of America's deliberate practice was to string homeowners along with no intention of providing permanent modifications. We were instructed to inform every homeowner who called in that their file was "under review" - even where the computer system showed that the file had not been accessed in months or when the homeowner had been rejected for a modification."

c. BOA employees "were instructed to inform homeowners that modification documents were not received on time, not received at all, or that documents were missing, even when, in fact, all documents were received in full and on time."

d. She "witnessed employees and managers change and falsify information in the systems of record, and remove documents from homeowners' files to make the account appear ineligible for a loan modification. This included falsifying electronic records so that the records would no longer show that the homeowner had sent in required documents or had made required payments. This was done so that the file could be closed, the homeowner's effort to obtain a loan modification could be rejected, and the manager could meet Bank of America's production goal for the given week or month."

e. She also observed that "Bank of America often avoided extending HAMP modifications by sending non- HAMP modifications to homeowners who had applied for a HAMP modification. These non- HAMP modifications were typically on worse terms for the homeowner than what they were eligible to receive under HAMP - but they were at higher interest rates and more profitable for Bank of America. I fielded dozens of calls from homeowners who had waited months for a HAMP modification and were confused, and often in tears, when they received a modification that appeared nothing like what they were led to expect."

24.    According to the May 13, 2013 Declaration of former BOA underwriter Steven

Cupples (**Exhibit 6**):

a. "Bank of America retained outside vendors to manage the documents being sent to and received from borrowers applying for HAMP modifications. Urban Lending Solutions was one of the vendors tasked to receive and upload financial documents from borrowers."  Mr. Cupples "quickly realized that if the loan had documents that were sent to Urban, those documents would be scattered over various links in the computer systems. The documents were present, but they often could not be viewed using a single system. An underwriter would need to know to go to other systems such as IPORTAL, LMA, LMF, or HomeSaver to review documents the borrower had sent. Most underwriters did not know that they needed to look for

documents in multiple systems and often assumed documents had not been sent. As a result, many borrowers were declined loan modifications they should have received.

    b.   Mr. Cupples "observed that Bank of America reported to the Treasury Department and made public statements regarding the volume of loans it was successfully modifying, and the efforts it was making to catch up with the volume.  Often this involved double counting loans that were in different stages of the modification process. It also involved counting loans that were entitled to modifications as having been modified - only to foreclose on those same loans later. It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true."

25.    BOA and its agents never properly hired, trained, or equipped a workforce to handle its obligation to provide HAMP modifications to the customers whose mortgages it serviced.

26.    BOA contracted with Urban Lending Solutions, ("Urban") to handle a variety of services relating to its participation in HAMP under the Agreement.

27.    Urban is a privately held company based in Pittsburgh, providing services to the mortgage industry.   On its website, Urban indicates it is an industry leader in providing "a wide variety of outsourced services to its clients including mortgage fulfillment services, home retention solutions, appraisals and valuation services, title and settlement services, document fulfillment, call center and collection services."

28.    However, the processes and procedures employed by BOA and Urban were diametrically opposed to the intent and purpose of HAMP, and Urban agreed and conspired to frustrate HAMP applicants.

29.    As part of its complex scheme to defraud the Federal Government and taxpayers, BOA folded Urban employees into its HAMP operations and gave these employees misleading BOA titles.  To the outside world of homeowners and regulators, Urban's workforce appeared indistinguishable from BOA's own employees.

30.     BOA used this workforce to solicit and direct homeowners to return documents, via FedEx to Urban.  HAMP modification applicants sent hundreds of thousands of FedEx packages to Urban.  Urban hired scores of employees to accept and scan millions of pages of original documents, including homeowner financials, to be saved on the Urban Portal. Unfortunately for the applicants, as explained in this Complaint and declarations by former BOA employees, the Urban Portal was designed to be and became a "black hole" for all those documents.

31.     BOA's fraudulent scheme worked as intended. A January 27, 2017 Inspector General Report to Congress found BOA "[w]rongfully denying homeowners admission into HAMP" and "denied 79% of all who applied for HAMP" concluding in its report to Congress that "[t]his should be unacceptable given that Bank of America has already received about $2 billion from [the] Treasury for HAMP."  **Exhibit 7**.

### U.S. Department of Justice Sues BOA for the Fraudulent HAMP Scheme

32.     Servicers, including BOA received incentive payments to complete HAMP modifications and in March 2010, the incentive was increased to $2,000.00. Accordingly, the incentive for BOA to fraudulently report completed HAMP modifications is clear.

33.     In a lawsuit by the Federal Government against BOA in the Eastern District of New York, initiated by a whistleblower, BOA agreed to pay back $1 billion under the Federal False Claims Act.  *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.) The August 2014 settlement also included BOA agreeing to "pay $7 billion in relief to struggling homeowners, borrowers and communities affected by the bank's conduct."[4]

---

[4] August 21, 2014 U.S Justice Department News Release dated August 21, 2014. ("Justice Department News Release"), available at https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department settlement-financial-fraud-leading

**Class Action Claims Denied in Favor of Individual Claims**

34.     The Multi District Litigation case *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, M.D.L. No. 10–2193–RWZ was filed in 2011 and included class action cases from across the country.  In denying class certification of the multi-district class, the Massachusetts District Court concluded:

> This case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process. Plaintiffs have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications. *See* Third Am. Compl., ¶¶ 135–473 (describing the different experiences of each named plaintiff). Plaintiffs' claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis. Because plaintiffs have failed to meet the predominance and superiority requirements of Rule 23(b)(3), their motion for class certification (Docket # 208) is DENIED. *Goldman v. Bank of America, NA, et al.*, 2013 WL 4759649. **Exhibit 8**

35.     It is now up to individual borrowers to file individual lawsuits to recover damages resulting from the systematic fraudulent practices of BOA with regard to HAMP.

**FACTUAL ALLEGATIONS**

36.     Plaintiffs, Ronald and Sharon Captain, are citizens of Leon County, Florida, residing at 9783 Wyntree Lane, Tallahassee, Florida.

37.     On June 22, 2004, Plaintiffs, Ronald and Sharon Captain, executed a mortgage and note for their home located at 3300 NW 97 Ave., Sunrise, Broward County, Florida in the amount of $270,000 with regular monthly payments set at $2,336.64. The lender was Countrywide Home Loans, Inc.

38.     Subsequently, BOA began servicing the mortgage and the loan was assigned number 67131011.

39.     After experiencing financial hardship, due in part to the state of the economy, Plaintiffs contacted BOA by phone in January 2009, requesting a HAMP modification.

40.     BOA provided Mr. and Mrs. Captain a HAMP application and they properly completed the application and returned it to BOA in June 2009 with the requested supporting financial documents.

### False Statements of Fact Concerning Plaintiffs' HAMP Application by Defendant

41.     In June 2009, BOA provided Plaintiffs a HAMP application and the properly completed the application and returned it to BOA with the requested supporting financial documents.

42.      However, as part of BOA's fraudulent scheme, on or about August 18, 2009, Plaintiffs were falsely informed by BOA employees, Judy and Robert, that the documents were "not received." Then, on August 25, 2009, Plaintiffs were again told by BOA, via email, that there was no program assigned and "no paperwork received," despite the fact that Plaintiffs had submitted the documentation three separate times. The same or similar statements were made on subsequent phone calls. Judy and Robert and other BOA employees knew these representations were false and this practice was policy and procedure at BOA.  *See* **Exhibits 2, 3, 4, 5 and 6**.

43.     These false statements were made by BOA employees, Judy and Robert, and others for the purpose of inducing Plaintiffs to resend their modification application over and over in order frustrate the application process.

44.     These misrepresentations were made to Plaintiffs by BOA representatives, Judy and Robert, and others, not for the purpose of processing Plaintiffs' application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure.  BOA employees knew these

statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting the quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.**

45.     Plaintiffs believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, fax, and Federal Express.  By December 26, 2009, Plaintiffs had submitted their application and supporting material more than five (5) times.  As a direct result, Plaintiffs were damaged and suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

46.     Plaintiffs did not know, and could not have reasonably discovered, that these statements were false until they retained their attorneys in this matter.

47.     By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiffs' modification application, as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

48.     On June 12, 2009, the effective date of Plaintiffs' Trial Payment Period, BOA sent Plaintiffs a letter via Fed Ex stating their application was "approved", and requested they make "trial payments" of more than $1,807.12 pursuant to the Federal Government's Home Affordable Modification Program.  This was false, as the application was not approved.  Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

49.     This false statement of fact and intentional omission was intended to cause Plaintiffs to make trial payments to BOA, not for the purpose of compliance with HAMP or processing their HAMP application, but to cause Plaintiffs to send trial payments so BOA could

retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged.

50.     It was and is BOA's practice to place "trial period payments . . . into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. *See* July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722.   BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

51.     Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that their trial payments were not applied to their account until they retained their attorneys in this matter.

52.     Plaintiffs were informed that they were approved for a Trial Payment Period via Fed Ex letter from BOA.  Relying on BOA's misrepresentations and omissions, Plaintiffs made three (3) payments of $1,807.12 in 2009 hoping to save their home. On August 26, 2009, Plaintiffs were told to keep working on their loan modification. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on June 11, 2014 Plaintiffs' home was foreclosed by BOA.  As a result of the foreclosure, a judgment in the amount of $398,863.77 was entered against Plaintiffs, which was $128,863.77 more than their original mortgage.  Plaintiffs moved out of their home in 2014.

53.     Plaintiffs suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit their account, the loss of their home and the equity in that home, as well as damage to their credit and the loss of some or all of the funds paid to BOA for trial payments.

54.     By making these misrepresentations, BOA profited by retaining Plaintiffs' trial payments for profit.  BOA further profited by forcing Plaintiffs into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiffs' modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A.

### Fraudulent Omission of the Application of Inspection Fees by BOA

55.     Despite the fact that Plaintiffs lived in their home until 2014 BOA charged their account for a "Property Inspection" on thirty-nine times (39) occasions from 2007 to 2014, all while they were living in the home.  These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account and added to the foreclosure judgment amount.

56.     BOA committed common law fraud upon the Plaintiffs when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on their home and charging their account inspection fees.

57.     BOA committed common law fraud upon Plaintiffs when the bank requested they make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiffs for trial payments to fraudulent inspection fees.

58.     The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees misled the Plaintiffs into believing their trial payments would be applied to their mortgage and were for the purpose of final approval of their HAMP application.   BOA had a duty inform Plaintiffs of this practice and intentionally refused to do so.

59.     As a direct result of the omission, Plaintiffs lost some of the funds sent to BOA for trial payments they believed were for final approval of their HAMP application.  BOA profited by charging Plaintiffs' account for the inspection fees and applying some of the trial payments received from Plaintiffs and retaining those funds for profit.

60.     Plaintiffs did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of their trial payments to pay those fees until they retained their attorneys in this matter.

61.     Upon information and belief, BOA further profited by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

62.     As Plaintiffs have suffered a loss of their home and the equity in that home, as well as the loss of future equity in their home, their claim exceeds $75,000.00 and satisfies the amount in controversy required under 28 U.S.C. §1332.  *See also Alonzo v. Bank of America, N.A.* Case No. 8:17-cv-00238-T-23-MAP (Fla. M.D. 2017).

## BOA FRAUDULENTLY CONCEALED THE FACTS GIVING RISE TO THE PLAINTIFFS' CLAIMS

63.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

64.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs the series of secretive and deceptive acts set forth in this Complaint that caused Plaintiffs to be unable to obtain a HAMP mortgage modification and ultimately resulted in a foreclosure of Plaintiffs' home.

65.     Plaintiffs were not aware, and could not have reasonably discovered BOA's fraudulent behavior until they retained their attorneys in this matter.

66.     Defendants elected to conceal the true nature of their scheme by adopting and implementing procedures to conceal the extent and nature their scheme to deny consumer like the Plaintiffs the opportunity to modify their home mortgage under HAMP, to impose fraudulent fees upon Plaintiffs as alleged in the complaint and to misappropriate Plaintiffs mortgage and/or TPP payments.  For example, the February 2017 sworn declaration by former BOA employee, Rodrigo Heinle, explained BOA's strategy of borrowers submitting mortgage modification documents into a black hole' by informing homeowners that modification documents were "incomplete and/or missing when they were not, or simply claiming files were 'under review' when they were not." **Exhibit 2**.  Further, this fraudulent scheme of concealment was continued by deleting HAMP applications, sometimes as much as "up to six thousand application files in a single day." **Exhibit 2.**

67.     Because the conduct which caused Plaintiffs' losses in this matter was purposefully hidden and secretive, Plaintiffs ability to assert the claim pled herein was inherently undiscoverable prior to the time Plaintiffs retained their attorneys in this matter.

68.     Because the Plaintiffs did not know and could not have reasonably discovered the facts that formed the basis of their fraud claims against BOA until they retained their attorneys in this matter, the time in which to file their claims under the applicable statute of limitations did not begin to run until Plaintiffs retained their attorneys in this matter.  The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment as set forth above in this Complaint.

69.     The lack of awareness concerning the causal relationship between BOA's fraudulent scheme and Plaintiffs' foreclosure was not the result of silence or passive concealment. Defendants, engaged in deliberate acts (i.e. affirmative misrepresentations, shredding documents, etc.) to prevent subsequent discovery.

70.      In the alternative, BOA's conduct made it impossible for Plaintiffs to discover that they had a claim against BOA within the applicable limitations period.  In particular, Defendant's intentional misrepresentations, omissions, and systematic destruction of documents constituted active concealment regarding the true nature of BOA's HAMP practices prevented Plaintiffs from discovering the wrongful acts on which the causes of action are based.  Plaintiffs did not discover the existence of BOA's fraudulent HAMP mortgage modification denial scheme as the cause of their foreclosure until around the time Plaintiffs retained their attorneys in this matter. Thus, while Plaintiffs acted diligently to determine both the nature and the cause of their injuries, Plaintiffs' efforts were thwarted by Defendants' fraudulent concealment.  Plaintiffs filed this lawsuit within the applicable limitations period of the date Plaintiffs knew or through the exercise of reasonable care and due diligence should have known of the claim.

71.     Plaintiffs filed this lawsuit within the applicable limitations period when they had a reasonable basis to bring the claims asserted herein. _See_ **Exhibit 8**. The Plaintiffs are not attorneys and do not actively monitor the dockets of courts throughout the country. There was no widespread media coverage of the matter, and BOA, who was uniquely aware of the facts which caused it to pay the government over a billion dollars, failed to provide any additional substantive disclosure to their borrowers who had applied for HAMP of their scheme.

72.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent conduct, as described in the preceding paragraphs. Defendants, through their

affirmative misrepresentations and omissions, actively concealed from Plaintiffs their fraudulent scheme to ultimately deny Plaintiffs a HAMP modification and force Plaintiffs into foreclosure.

73.     Further, under the doctrine established in *American Pipe and Construction Co.,* the statute of limitations is tolled until the denial of class certification.   *American Pipe and Construction Co. et al., v. Utah*, 414 U.S. 538, 94 S. Ct. 756 (1974) (holding that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties"). Plaintiffs are putative members of a currently pending class action lawsuit asserting claims substantially similar to those pled here. *See George v. Urban Settlement Servs. Et al.*, Civ. Action No. 13-v-01819-PAB-KLM (D. Colo). The *George* class was filed in 2013.  Accordingly, the time for Plaintiffs to file an individual claim against BOA has been tolled from 2013 through the date this complaint was filed.

**COUNT I**
**(Common Law Fraud)**

74.     The allegations in the preceding paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

75.     BOA made false statements of fact to Plaintiffs through the fraudulent scheme described in this Complaint.

76.     Plaintiffs were falsely informed by BOA employees that their HAMP application documents were not received, were incomplete or were not current, causing Plaintiffs to resubmit the information again and again.

77.     BOA made false statements of fact and intentional omissions when Plaintiffs were informed they were "approved" and requested they make "trial payments."

78.     BOA employees made these statements with knowledge they were false.

79.     BOA made these statements for the purpose of inducing Plaintiffs to rely on them.

80.     Plaintiffs believed these statements were true, relied on them, and as a result, suffered damages when they refrained from making their regular mortgage payments.

81.     Plaintiffs believed these statements were true, relied on them, and as a result, suffered damages when they unnecessarily sent their HAMP application and supporting information via U. S. Mail and Federal Express more over and over.

82.     Plaintiffs believed these statements were true, relied on them, and as a result, suffered damages when they made trial payments that were either retained for profit or applied to fraudulent inspection fees by BOA.

83.     As a direct and proximate cause of the knowing misrepresentations and omissions by BOA described in the Complaint, Plaintiffs suffered damages including but not limited to the costs for sending their HAMP applications and financial documents on multiple occasions when BOA had no intention of reviewing it, the loss of time spent sending and re-sending the HAMP application and financial documents, the loss of their home and the equity in that home, as well as damage to their credit and the loss of some or all of the funds paid to BOA for trial payments for which BOA retained for profit after foreclosure.

84.     Due to the intentional omission, Plaintiffs were unaware their trial payments were being used to pay fraudulent inspection fees by BOA that were impermissible.

85.     For example, absent a specific finding of need by a local HUD office, the shortest period between inspections authorized by the HUD servicing guidelines is 25 days:

> Generally, reimbursement will be limited to one inspection for each 30-day cycle.  This inspection should not be earlier than 25 days from the last inspection or later than 35 days after the last inspection.  A distinction must be made between those items which are required and those which are merely recommended.  Only where a local HUD Office has identified a need to inspect more frequently, and has made this a requirement, will a mortgagee be reimbursed for these additional inspections.  *HUD Servicing Guidelines,*

> *Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (c)(2)(a).*

86.     Further, multiple inspections are only allowed when the mortgaged property is

vacant:

> Where the mortgage is in default and the mortgagee has established that the mortgaged property is vacant, mortgagees shall inspect the mortgaged property every 25 to 35 days. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (c).*

87.     However, even before a series of inspections may begin, under HUD servicing

guidelines, the mortgage must be in default, and the mortgagee is required to determine the

Plaintiffs' home was vacant/abandoned by making a phone call and performing a visual inspection

to ensure the property had become vacant/abandoned:

> When the mortgage is in default and a payment is not received within 45 days of the due date and efforts to reach the mortgagor or occupant at least by telephone have been unsuccessful, the mortgagee must perform a visual inspection of the mortgaged property to determine if it has become vacant or abandoned. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (a)(1).*

88.     BOA conducted inspection after inspection, all while Plaintiffs were living in their

home.  Although there is no private cause of action under the Guidelines for the Plaintiffs, these

fees are but one example of the overall fraudulent mortgage servicing scheme BOA has operated

for years and for which Plaintiffs have been victimized.

89.     As a direct and proximate cause of the knowing omissions by BOA described in

the Complaint, Plaintiffs suffered damages in the loss of funds paid to BOA for trial payments for

which BOA applied to fraudulent inspection fees.

**WHEREFORE**, Plaintiffs pray:

1.      The Court enter a judgment for Plaintiffs and against BOA for Common Law Fraud

in an amount to be determined by the Court at a trial in this matter;

2.      The Court tax costs of this action to BOA;

3.      For such other and further relief as the Court may deem just and proper; and

4.      The Court conduct a trial by jury on all issues.


Dated: January 22, 2018

                                        /s/ Caitlyn C. Prichard
                                        CAITLYN C. PRICHARD
                                        Florida Bar No. 0127097
                                        Aylstock, Witkin, Kreis & Overholtz, PLLC
                                        17 E. Main Street, Suite 200
                                        Pensacola, FL 32502
                                        Phone: (850) 202-1010
                                        Fax: (850) 916-7449
                                        Email: cprichard@awkolaw.com